# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN OROZCO TOVAR,<br><br>　　　　　Petitioner,<br><br>　　v.<br><br>FERNANDO GONZALEZ, Warden,<br><br>　　　　　Respondent.<br>_____/ | 1:08-cv-01462-AWI-SMS (HC)<br><br>FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS<br><br>[Doc. 1] |

    Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

RELEVANT HISTORY

    Following a jury trial in the Superior Court of the State of California, County of Fresno, Petitioner was convicted of attempted murder (Cal. Pen. Code[1] § 664/187(a)), assault with a firearm (§ 245(a)(2), and possession of a deadly weapon (§ 12020(a)). It was also found true that Petitioner personally inflicted great bodily injury as a result of discharging a firearm from a motor vehicle in the commission of the attempted murder and assault. (Lodged Doc. No. 1, at 70-73.)

---

[1] All further statutory references are to the California Penal Code unless otherwise indicated.

On June 2, 2006, Petitioner was sentenced to nine years for the attempted murder conviction, plus a twenty-five-years-to-life enhancement under § 12022.53(d), to be served consecutively.[2] (Lodged Doc. No. 1, at 211-213.)

On August 8, 2007, the California Court of Appeal, Fifth Appellate District affirmed the judgment. (Lodged Doc. No. 3.)

On September 18, 2007, Petitioner filed a petition for review in the California Supreme Court, which was denied on October 24, 2007. (Lodged Doc. Nos. 4, 5.)

Petitioner filed the instant federal petition for writ of habeas corpus on September 29, 2008. (Court Doc. 1.) Respondent filed an answer to the petition on December 30, 2008. (Court Doc. 13.) Petitioner filed a traverse on July 16, 2009. (Court Doc. 35.)

## STATEMENT OF FACTS

On December 2, 2005, at approximately 1:48 a.m., Sheriff's Deputy Jeff Stricker arrived at Fresno Community Hospital to investigate a victim of gunshots. (RT 35-36.) He made contact with the victim, Juan Larios, and his wife, in the emergency room. (RT 36.) The victim appeared to be coherent and Deputy Stricker questioned him regarding the shooting. He was initially a little standoffish, but began volunteering information after he questioned the victim's wife. (RT 37.) Larios told Deputy Stricker that he was shot by his long-time friend Juan Tovar, at his residence on Simpson Avenue, and it occurred at approximately 1:00 a.m. (RT 38.) Larios told Deputy Stricker that he and Petitioner were having an argument outside his residence, and as he was leaning against Petitioner's truck, Petitioner picked up a gun, pointed it at him, and pulled the trigger. Larios was struck twice. (RT 38.) Larios stated that he did not "want to get [his] friend in trouble[.]" (Id.) He also stated "[Petitioner] is dangerous. When you pick him up, be careful. If he did this to me, who knows what he would do to someone he doesn't know[.]" (Id.)

While Larios was being treated at the hospital, a bullet fell out of his clothing, which was consistent with a .380-caliber hollow-point bullet. (RT 98-99.) The bullet had some small tissue

---

[2] The court struck the other enhancements as to count 1. The court stayed a concurrent upper term sentence of four years and corresponding enhancements for the assault conviction. A concurrent term of three years was imposed for the possession conviction. (Lodged Doc. No. 1, at 211-213; Lodged Doc. No. 2, at 1206-1207.)

2

within the hallow-point, consistent with going in and out of a person's body.  (RT 99.)

At approximately 2:05 a.m. that same evening, Deputy Daniel Buie arrived at 4756 Simpson Avenue-the victim's residence, to collect potential evidence from the shooting.  (RT 30-31.)  Deputy Buie discovered a small pool of blood on the ground next to a brown Ford vehicle, and on the front porch outside the front door.  (RT 31.)  There was also a small amount of blood splattered on the interior wall next to the door on the east side of the residence.  (Id.)  In addition, there were drops of blood on the floor in the dining room and down the hallway.  (Id.)  Police also discovered gun shell casing outside the residence which were consistent with a .380-caliber semi-automatic handgun.  (RT 32.)

Petitioner was arrested later that morning at his residence, and officer's obtained a search warrant for the residence.  (RT 54-55.)  Deputy Mark Chapman made contact with Petitioner at his residence, and also spoke with his wife and 15-year-old daughter.  (RT 55.)  Petitioner denied any involvement in the shooting of Larios and told Deputy Chapman that he needed to look into Larios' financial background.  (RT 87-88.)

Deputy Chapman discovered that Petitioner was an ex-felon and prohibited from carrying certain types of weapons.  (RT 57.)  The following items were discovered during a search of the bathroom connected to the master bedroom shared by Petitioner and his wife: a magazine for a 9-millimeter semi-automatic handgun; a full jacketed hollow point 380 caliber live bullet, with a head stamp RP (Remington and Peters); an empty gun case; a fully jacketed 9-millimeter Luger bullet; and two nine-millimeter Luger round nose bullets.  (RT 59-62, 64-66, 67-68.)  Chapman believed that the .380-caliber bullet recovered from Petitioner's residence was consistent with the shell casings (same caliber and manufacturer) found outside Larios's house; however, forensic testing was not performed.  (RT 90-91.)

There was a large cargo trailer in the backyard of Petitioner's residence, which was separated into two areas.  (RT 63.)  There were doors on the north and south sides of the trailer.  (Id.)  The north side consisted of several different types of tools.  (RT 64.)  The south side was set up with a desk, telephone, television, and stereo.  (Id.)  Petitioner's wife confirmed that Petitioner had access to the trailer.  (RT 63.)  A pair of brass knuckles was discovered on the

3

south side of the trailer on a speaker attached to the entertainment center. (RT 62-63.) An empty gun holster with a belt clip was found in the north side of the trailer. (RT 66-67.)

Deputy Chapman interviewed Petitioner's wife regarding her activities on the evening of December 1, 2005. Mrs. Tovar indicated that she arrived home from work at approximately 8:15 p.m., and Petitioner left the residence just shortly thereafter between 8:30 and 8:45 p.m.. Mrs. Tovar said she went to sleep a short time later. She woke up between 1:00 and 1:30 in the morning to give her infant child a bottle. When she woke up, Petitioner was asleep in bed with her. (RT 108.) She did not see Petitioner from the time he left to the time she woke up in the early morning. (RT 108-109.) She indicated that Petitioner used to have a cellular telephone but it was disconnected. (RT 109.)

After completing the investigation at Petitioner's residence, Deputy Chapman returned to the sheriff's office and received a message from Larios's brother. (RT 69.) Deputy Chapman returned the call and arranged for the brother to bring Larios to the sheriff's department for an interview. (Id.) Later that same day, December 2, 2005, Larios's brother brought Mr. and Mrs. Larios to the sheriff's department. (RT 70.) Larios was released from the hospital earlier that morning and Deputy Chapman did not believe he was taking any medication. (RT 85.) Nor did Deputy Chapman believe Larios to be under the influence of drugs or intoxicated at the time of the interview.[3] (RT 85-86.) Deputy Chapman interviewed Larios in the interview room, while his wife and brother waited in the lobby. (Id.) The interview lasted approximately an hour to an hour and a half. (RT 73.) Larios told Deputy Chapman that he was shot by Petitioner. (RT 70-71.) Larios confirmed the identify of Petitioner from reviewing prior arrest and wedding photographs of him. (RT 71.) Larios stated that he and Petitioner had been friends their entire lifes. (RT 73-74.)

Larios revealed that he rented a bedroom at the residence he shared with his wife. A female named Fire resided in the bedroom some of time. Fire apparently "had a way of paying people's bills." (RT 75.) Approximately eight weeks before the shooting, Larios introduced

---

[3] On cross-examination, Deputy Chapman acknowledged that he was not aware of any pain medication administered at the hospital or that Larios was a self-professed daily methamphetamine user. (RT 93.)

4

Petitioner to Fire because Petitioner had an unpaid debt. (Id.) Apparently Fire never paid off the debt and Petitioner was upset. At one point, Petitioner told Larios that he was going to be held responsible for the debt since he introduced him to Fire. (RT 75.)

A problem later erupted when Larios agreed to allow three different women to use the empty bedroom at his residence. About a week before the shooting, Fire apparently moved some stuff into the bedroom and left about three days later, and was gone for a period of time. (RT 76.) During this time, Petitioner asked Larios if his girlfriend, Crissy, could stay in the room and he would forgive the debt. (RT 76-77.) Crissy stayed in the home for approximately five days prior to the shooting. (RT 77.) Petitioner would pick up Crissy, take her to work, and the two would return later together and stay in the room. (RT 77.) Larios became upset because he felt that Petitioner was using the room as a hotel room to have sex with Crissy. (RT 77-78.) On December 1, 2005-the day before the shooting-Monique who was pregnant by Larios's brother, asked if she could stay in the room. (RT 78.) Larios agreed to allow Monique to use the room, and he told Crissy she could stay in the house but Monique was going to use the room. (Id.) However, that same day, Fire came back and started to move some of her belongings back into the bedroom. (Id.)

Later that evening, between 8:00 and 9:00 p.m., Petitioner and Crissy arrived at Larios's residence and wanted to use the bedroom. (RT 79.) Larios refused Petitioner access to the room and Petitioner became angry. Larios told Petitioner that he would ask Fire if she would allow them to use the bedroom. (Id.) Petitioner and Crissy then left the residence, and returned about an hour later. (Id.) Larios informed Petitioner that Fire would not allow them to use the bedroom. (RT 79-80.) Petitioner wanted to take Fire from the residence and have her repay his debt. (RT 80.) Petitioner was upset and told Larios "You know what, I can't believe you put a bitch between us - - between our friendship." (RT 81-82.) Petitioner told Larios that he "owe[d] [him] a lot." (RT 82.) Petitioner told Larios "you really don't know. I'll be back." (Id.) Petitioner and Crissy then left the residence. (Id.) About ten minutes later, there was a knock on Larios's front door. (Id.) Monique's mother was at the door and told Petitioner that there were people in the front yard looking for "Tacho" (Petitioner's nickname). (RT 19, 82-83.) Larios

5

walked outside and saw Petitioner seated in the driver's seat of his truck and Crissy was sitting next to him. (RT 83.) Petitioner was talking on the telephone as Larios walked up to the passenger door. (Id.) The window of the passenger door was down. (Id.) Petitioner finished the conversation, made a comment, then raised his right arm extended it across the cab of the truck toward the passenger side window where Petitioner was standing, and pointed a handgun at Petitioner's head. (RT 83-84.) The gun was approximately two feet from his head. (RT 84.) Larios ducked and moved toward the front of the truck. (Id.) However, he was hit twice by the gunfire, once in the arm and upper leg. (Id.) Petitioner continued firing the gun and then stopped and drove away. (RT 85.) Larios was driven to the hospital shortly thereafter by family members. (Id.)

At trial, Larios denied making any statements to sheriff's deputies implicating Petitioner in the shooting. (See RT 11-26.) Larios testified that he told a defense investigator that the things written in the police reports were untrue. (RT 22.) Larios acknowledged that he was shot in December of 2005, but stated he did not know who shot him. Larios testified that on the evening prior to the shooting, he had used "quite a bit" of crystal methamphetamine and drank "quite a bit" of alcohol. (RT 26.) The morning after the shooting he was in shock and a lot of pain. (RT 26.) Larios testified that he was not interviewed by Deputy Stricker at the hospital. (RT 14.) Larios denied telling Deputies Stricker and Chapman that Petitioner was the individual who shot him. (Id.) Larios denied knowing two females by the names of Fire and Crissy, and no one stayed at his home aside from his wife. (RT 12-13.) Larios acknowledged that he was interviewed by Deputy Chapman on December 2, 2005, however, he believed it took place at his home. (RT 15.) He did not recall going to the sheriff's department. (Id.) Larios acknowledged that Petitioner was at his home on December 1, 2005, from about 3:00 or 4:00 p.m., but he did not see him after that time. (RT 18-19.)

Larios acknowledged that he has broken the law in the past, but he would not lie to protect Petitioner and no one threatened him or his family. (RT 23.) Larios acknowledged he sold drugs in the past and there may possibly be people out there that would like to see him dead.

(RT 27.) Larios stated that he was good friends with Petitioner and his wife and there was no reason such friendship should not continue. (RT 24.)

**Defense**

Petitioner did not testify at trial. However, Petitioner's wife, Elizabeth Tovar, testified that she remembered the night of the incident. She testified that she went to bed between 10:00 and 10:30 p.m., and woke up around 1:00 or 1:30 a.m. to give her infant daughter a bottle.[4] (RT 103.) At the time she woke up, Petitioner was home. (Id.) She stated that the Petitioner's truck was not operating on the night of the incident. (Id.) Mrs. Tovar testified that Petitioner left between 7:00 and 8:00 p.m. that evening and was home by 10:00 or 10:30 p.m. before she went to sleep.[5] (RT 104-105.)

## DISCUSSION

A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. §§ 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct.

---

[4] Mrs. Tovar denied telling Deputy Chapman that she went to bed that evening between 8:30 and 8:45 p.m. (RT 104.)

[5] Mrs. Tovar denied telling Deputy Chapman that the first time she saw Petitioner had returned home that evening was when she woke up about 1:00 or 1:30 a.m. (RT 105.)

1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.   Standard of Review

Where a petitioner files his federal habeas petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) citing Williams (Terry) v. Taylor, 529 U.S. 362, 405-06 (2000). A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." Id., quoting Williams, 529 U.S. at 409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002) (*per curiam*). "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted). "Rather, that application must be objectively unreasonable." Id. (citations omitted).

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law. See Lambert v. Blodgett, 393 F.3d 943, 976-77 (2004).

8

Courts further review the last reasoned state court opinion. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991). However, where the state court decided an issue on the merits but provided no reasoned decision, courts conduct "an independent review of the record . . . to determine whether the state court [was objectively unreasonable] in its application of controlling federal law." Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

C.   Insufficient Evidence Claim

Petitioner contends that there was insufficient evidence to support his conviction for attempted murder and the corresponding enhancements under California law. More specifically, Petitioner contends that defense counsel was deficient by failing to introduce the possibility of third party liability and there remained a reasonable doubt as to whether he committed the attempted murder charge.

   1.   *State Court Decision*

In finding that Petitioner's claim was implausible, the California Court of Appeal held the following:

> There are several problems with appellant's argument. First, Larios told the deputies that just before he was shot, he was inside his house and someone knocked on his door, he went into his front yard, and he discovered appellant and Crissy had returned in appellant's truck. He never clarified the exact location of the truck, whether it was parked in the street or in a driveway, and he refused to offer such details in his trial testimony. Second there was no evidence about the distance that shell casings would travel when ejected from a .380-caliber semi-automatic handgun. Deputy Chapman testified in a semi-automatic handgun, the bullets are stored in the magazine; when the gun is fired, an expended casing is removed and thrown through the action of the gun, and the new round is fed from the magazine into the firearm. The evidence did not foreclose the possibility that appellant was leaning near or through the passenger window as he fired, and the shell casings were ejected through that window.
>
> Third, Larios's account of the shooting is not internally inconsistent with the location of his wounds. Larios said he walked up to the passenger side of appellant's truck, and the passenger window was rolled down. Appellant extended his arm across the truck's cab, toward the open passenger window, and pointed the gun at Larios's head. Larios stated he started to duck and appellant fired the gun. Larios moved toward the front of the truck and appellant continued to fire. Despite his evasive maneuvers, Lario was shot in the left arm and left leg. Larios was standing next to the passenger window as the shots were fired; he never said that he was shot as he stood in front of appellant's truck, only that he

    ducked and moved toward the front as the shots were fired.  Larios never clarified whether he was wounded by the initial shots or the later shots.  Larios's wounds to his left arm and leg are entirely consistent with appellant's act of aiming the gun through the open passenger window as Larios tried to take evasive action.

    Fourth, Larios's account is not inconsistent with the location of the shell casings.  Larios stated that he saw appellant reach across the cab and aim the gun at him.  Larios further stated that he ducked and appellant fired the gun.  Larios never said that he kept looking at appellant as the shots were fired.  There is a strong inference that appellant could have continued to fire at Larios, which would have allowed for at least two of the casings to land outside of the truck.

(Lodged Doc. No. 3, Opinion, at 24-25.)

    2.    *Applicable Law*

In evaluating insufficiency of the evidence claims, this Court must first determine whether the state court applied the correct constitutional standard set forth by the Supreme Court.  The law on insufficiency of the evidence claim is clearly established.  The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073 (1970).  The United States Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas corpus review, a federal court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

    On direct appeal, the California Court of Appeal set forth the applicable standard, in pertinent part, as follows:

    The reviewing court's task is to review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence–that is, evidence that is reasonable, credible, and of solid value–such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [citations] The focus of the substantial evidence test is on the whole record of evidence presented to the trier of fact, rather than on "'isolated bits of evidence.'" [citations]."

(Lodged Doc. No. 3, Opinion, at 22.)  The Court of Appeal properly identified the correct standard which is consistent with Jackson.  Accordingly, this Court must next determine whether

the appellate court's holding that the evidence was sufficient to convict Petitioner was an unreasonable application of the standard set forth in Jackson.

      3.    *Analysis of Claim*

As fully explained by the California Court of Appeal, there was more than sufficient evidence to support Petitioner's conviction for attempted murder. Petitioner points to factual circumstances which were contrary and/or not inconsistent to the record or were resolved by the jury in favor of the prosecution. While there was evidence that Crissy was present at the time of the shooting and Petitioner may have desired for his counsel to have argued that she could have committed the attempted murder, this does not render the evidence pointing to Petitioner's guilt insufficient under California law. In reviewing an insufficiency of the evidence claim, this Court must consider all of the evidence presented at trial and view it in the light most favorable to the prosecution. Jackson, 443 U.S. at 319. Considering the victim's testimony (although recanted at trial) to two different deputies on two different occasions that Petitioner shot him over a disagreement regarding a debt owed by a female acquaintance, any rationale trier of fact could have found beyond a reasonable doubt that Petitioner was guilty of attempted murder. Therefore, Petitioner has not presented a viable basis for this Court to conclude that there is insufficient evidence to support his conviction for attempted murder. The state appellate court's decision was not an "unreasonable application of" the Supreme Court's holding in Jackson, nor an unreasonable determination of the facts in light of the evidence presented.

D.    Ineffective Assistance of Trial Counsel

Petitioner contends that trial counsel rendered ineffective assistance in several respects. He claims counsel failed to make any pre-trial motions for severance of the trial in order to exclude potentially prejudicial evidence resulting from the jury learning of his alleged status as an ex-felon, counsel failed to object to improper prosecutorial questioning, and counsel failed to introduce the possibility of third party liability for the commission of the crimes charged.

      1.    *State Court Decision*

In denying Petitioner's claim, the Court of Appeal held, in relevant part:

11

Appellant raises numerous allegations of counsel's deficient performance-failure to move for bifurcation, failure to object to evidence of his ex-felon status, failure to object to the prosecutor's questions as irrelevant or leading-but he completely fails to address the impact of those alleged errors and/or omissions on the jury's verdict-whether there was a reasonable probability the results would have been different if defense counsel had taken the actions now demanded. The evidence against appellant was overwhelming. Deputy Stricker testified he interviewed Larios at the hospital, Larios did not appear under the influence of alcohol or narcotics, Larios was initially hesitant, but he clearly stated that appellant, his best friend, had shot him about one hour earlier. Deputy Chapman testified that he interviewed Larios at the sheriff's department later that day, Larios did not exhibit any signs of being under the influence of alcohol or narcotics, and Larios gave a detailed statement about the events leading up to the shooting. Larios repeatedly described appellant as his lifelong friend, and explained his initial hesitancy at the hospital was because he was in shock from being shot by his best friend.

In the face of this evidence, appellant complains that counsel's failure to move for bifurcation or severance of the charges based on his ex-felon status was prejudicially ineffective, because the jury heard that he was an ex-felon and such evidence would have affected the jury's evaluation of his credibility. In many cases involving ex-felon charges, a defendant may move for severance or even stipulate to his ex-felon status, so that the jury only considers the evidence of whether the defendant possessed the prohibited paraphernalia. In this case, however, defense counsel's failure to sever or stipulate worked to appellant's benefit, because the prosecutor completely failed to introduce competent evidence of his prior felony convictions and was compelled to dismiss those charges. If counsel had moved for severance or stipulated to his ex-felon status, the prosecutor could have avoided dismissal and appellant would have been faced with two additional felony convictions.

In any event, it is not reasonably probable the jury would have returned a more favorable verdict if Deputy Chapman's references to appellant's ex-felon status had been excluded or limiting instructions given. Appellant complains that such evidence destroyed his credibility to the jury. In the instant case, however, the disputed factual issue was Larios's credibility, between his clear, coherent pretrial statements about appellant's conduct, and his bizarre denials of those statements at trial. Larios did not claim the deputies did not accurately record his statements in his prior interviews. Instead, he completely denied giving any prior statements to any officer, that he spoke to anyone at the hospital, or that he had even been to the sheriff's department. Larios testified he had no idea who shot him because he consumed a lot of alcohol and crystal methamphetamine in the hours prior to the shooting, but he never allowed for the possibility that he might have talked to a deputy. Larios testified Deputy Chapman briefly spoke to him at his own house, but denied making any accusations against appellant, claimed he had never heard of Fire or Crissy, and insisted no one lived at his house besides his immediate family. On this record, appellant has completely failed to demonstrate the prejudice from counsel's alleged acts and/or omissions. (See, e.g., *Boyette, supra,* 29 Cal.4th at pp. 430-431 .)

Appellant similarly fails to demonstrate prejudice from counsel's failure to object to Deputy Chapman's testimony about Larios's statements, purportedly inadmissible as double hearsay. At trial, Larios was the first witness and steadfastly denied giving any statements to any law enforcement officer about the shooting. As such, Chapman properly testified to Larios's prior inconsistent

12

statements, and any objections based on multiple hearsay would have been overruled. (See, e.g., *People v. Perez* (2000) 82 Cal.App.4th 760, 764-767; *People v. Zapien* (1993) 4 Cal.4th 929, 952-955; *People v. Pinholster* (1992) 1 Cal.4th 865, 937-938.)

As for the relevancy and leading question issues, appellant concedes the objections might have been overruled. Indeed, counsel need not make meritless objections to avoid claims of ineffective assistance. ( *People v. Ochoa* (1998) 19 Cal.4th 353, 432.) Failure to object to leading questions certainly does not indicate incompetency; rather it sometimes is considered good trial technique not to object. ( *People v. Chavez* (1968) 262 Cal.App.2d 422, 432 .) Defense counsel could have concluded that relevancy and leading question objections would not have prevented the jury from hearing the substance of the deputies' testimony because the prosecutor easily could have properly rephrased his questions and, if necessary, used the law enforcement reports to refresh the deputies' recollection to elicit the same information that was coming out via leading questions. (See, e.g., *People v. Hayes* (1971) 19 Cal.App.3d 459, 471-472.)

We also reject appellant's assertion that counsel engaged in a " *laissez faire* demeanor" at trial. Even a cursory review of the transcript reveals that defense counsel actively participated in the trial, extensively cross-examined the prosecution witnesses, and regularly objected. The assignments of error raised on appeal "do not establish that 'the prosecution's case was not subjected to meaningful adversarial testing.' [Citation.]" ( *People v. Prieto* (2003) 30 Cal.4th 226, 261.)

Having considered the entirety of the record, we are satisfied that the evidence against appellant was extremely strong and counsel's alleged acts and/or omissions would not have affected the outcome of this case. We thus reject appellant's ineffective assistance claim because appellant has not established a reasonable probability that he would have received a more favorable verdict in the absence of defense counsel's complained of errors and/or omissions. (*Cox, supra,* 30 Cal.4th at pp. 1019-1020; *Boyette, supra*, 29 Cal.4th at pp. 430-431; *People v. Lucero* (2000) 23 Cal.4th 692, 728-729, 735; *In re Jackson, supra,* 3 Cal.4th at pp. 604-605.)

2.  *Applicable Law*

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  <u>Canales v. Roe</u>, 151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); <u>Lowry v. Lewis</u>, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. <u>Strickland</u>, 466 U.S. at 687.  The petitioner must show that counsel's

13

representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995). Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable. Strickland, 466 U.S. at 688. The court must also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness. Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994). More precisely, petitioner must show that (1) his attorney's performance was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different.

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984). Since it is necessary to prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

Ineffective assistance of counsel claims are analyzed under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362 (2000). Weighall v. Middle, 215 F.3d 1058, 1062 (2000).

    3.    *Analysis of Claim*

Although Petitioner raises several instances of alleged incompetence on the part of his trial counsel, Petitioner has failed to demonstrate the requisite prejudice from such conduct. Strickland, 466 U.S. at 697.

With regard to Petitioner's claim that counsel was incompetent for failing to sever his prior convictions, the appellate court stated:

> [D]efense counsel's failure to sever [charges based on his ex-felon status] or stipulate worked to appellant's benefit, because the prosecutor completely failed to introduce competent evidence of his prior felony convictions and was compelled to dismiss those charges. If counsel had moved for severance or stipulated to his ex-felon status, the prosecutor could have avoided dismissal and appellant would have been faced with two additional felony convictions.
>
> In any event, it is not reasonably probable that the jury would have returned a more favorable verdict if Deputy Chapman's references to appellant's ex-felon status had been excluded or limiting instructions given.

(Lodged Doc. 3, Opinion, at 18-19.)

While counsel could have moved to sever or stipulate to the prior convictions and even if it is assumed that his failure to do so was incompetent, there was no prejudice to Petitioner because it resulted in two of the charges being dismissed. Accordingly, relief under Strickland is foreclosed.

The appellate court also rejected Petitioner's claim regarding counsel's failure to object to improper prosecutorial questioning stating:

> Appellant similarly fails to demonstrate prejudice from counsel's failure to object to Deputy Chapman's testimony about Larios's statements, purportedly inadmissible as double hearsay. At trial, Larios was the first witness and steadfastly denied giving statements to any law enforcement officer about the shooting. As such, Chapman properly testified to Larios's prior inconsistent statements, and any objections based on multiple hearsay would have been excluded. [Citations.] . . . As for the relevancy and leading question issues . . . [d]efense counsel could have concluded that relevancy and leading question objections would not have prevented the jury from hearing the substance of the deputies' testimony because the prosecutor easily could have properly rephrased his questions and, if necessary, used the law enforcement reports to refresh the deputies' recollection to elicit the same information that was coming out via leading questions. [Citation.] . . . [D]efense counsel actively participated in the trial, extensively cross-examined the prosecution witnesses, and regularly objected.

(Lodged Doc. No. 3, Opinion, at 20.)

The appellate court likewise denied Petitioner's claim that counsel was ineffective for failing to present evidence of third-party culpability or to move for dismissal based on insufficient evidence, stating defense counsel

> was presented with a situation in which the victim gave two detailed statements that appellant shot him. At trial, the victim not only recanted those accusations, but claimed he never spoke to any law enforcement officers about the shooting, and denied any knowledge of Fire, Crissy, or anyone other than his family living at his house. Appellant's wife testified appellant was with her all evening, further eliminating the possible argument that appellant was sitting in the driver's seat

15

> while Crissy shot Larios. Counsel seized on Larios's admission that he previously sold drugs, as the basis for the argument that Larios's own conduct led to the shooting, and argued Larios was being evasive because he did not want to implicate himself in criminal activities. On this record, we cannot say that counsel's tactical defense decisions were prejudicially ineffective.

(Lodged Doc. No. 3, Opinion, at 26-27.)

This finding is supported by the record and is not contrary to or an unreasonable application of the holding in Strickland, nor an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(1), (2). Although Petitioner points to several instances in which he contends counsel should have objected, Petitioner fails to demonstrate any resulting prejudice. Absent any showing of prejudice, Petitioner's claim fails under Strickland and must be denied. In addition, for the reasons explained *supra*, there is no merit to Petitioner's claim that there was insufficient evidence to support his convictions, and therefore defense counsel could not have been ineffective for failing to raise a meritless argument. See James v. Borg, 24 F.3d 20, 27 (9th Cir. 1994), *cert. denied*, 513 U.S. 935, 115 S.Ct. 333 (1994) (holding that an attorney's failure to make a futile motion is not ineffective assistance of counsel); Shah v. United States, 878 F.2d 1156, 1162 (9th Cir. 1989) (counsel's failure to raise meritless legal argument does not constitute ineffective assistance of counsel).

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The instant petition for writ of habeas corpus be DENIED; and
2. The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. §

636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

    IT IS SO ORDERED.

**Dated:   August 26, 2009**               /s/ Sandra M. Snyder
                                           UNITED STATES MAGISTRATE JUDGE